[No. 22628.   Department Two.   April 28, 1931.]

VANCE LUMBER COMPANY, *Appellant,* v. FRASER, GOODWIN & COLVER, *Respondent.*[1]

[1]Reported in 298 Pac. 438.

*Poe, Falknor, Falknor & Emory,* for appellant.

*Caldwell & Lycette* and *Dean H. Eastman,* for respondent.

MILLARD, J.—Plaintiff appeals from a judgment denying petition for return to it from the receiver of the defendant corporation of ten thousand dollars of Texas corporation bonds.

The respondent corporation, prior to the appointment of a receiver for it on October 29, 1929, was engaged in the business of buying and selling stocks and securities for its customers, both on margin and by outright purchase. The respondent broker made sales and purchases of stocks and bonds for its customers through its eastern correspondents (stock brokers) Salomon Brothers & Hutzler and E. A. Pierce Company.

When respondent placed an order with its eastern correspondent for the purchase of stock, the correspondent made the purchase on the New York stock exchange, and charged the respondent's account with the purchase price of such stock. To secure the advances made by the eastern representatives for the purchase of stocks and bonds on respondent's order, the respondent pledged as collateral for such purchases certain recognized stocks and bonds. Some of the securities so pledged belonged to the respondent, and the remainder belonged to customers of the respondent. The customers' securities which were pledged by respondent were securities which had been

purchased through the correspondent, but had not been ordered delivered to the respondent, or were securities which had been deposited by the customers as collateral to their accounts with the respondent and by the respondent repledged to its eastern correspondents.

Respondent had also an account with the Canadian Bank of Commerce of Seattle and New York for loan advances made by the bank to the respondent, and had pledged with that bank, as security for such account, its own securities and securities belonging to its (respondent's) customers.

It does not appear that any customer, marginal or outright purchaser, ever authorized, orally or in writing, the respondent to pledge or repledge any of such customer's stock for any indebtedness of the respondent. In each case of repledging by the respondent, it was for an indebtedness exceeding the indebtedness the customer owed to the respondent.

The appellant was, for some time prior to the transaction out of which this controversy arose, a customer of respondent, through which it had purchased and sold securities. On October 10, 1929, the account was balanced. No indebtedness was then due either from the other. On that date, the appellant directed the respondent to purchase for it Texas corporation five per cent bonds for the value of ten thousand dollars. Respondent, on the same day, purchased through Salomon Brothers & Hutzler the Texas corporation bonds, and the account of the respondent with its eastern representatives was debited in that amount. On October 14, 1929, the appellant delivered to the respondent, to sell for such account, Kingdom of Norway bonds of the value of ten thousand dollars. Those bonds were sold by respondent on October 15, 1929, through E. A. Pierce Company and appellant's ac-

count with respondent credited in that amount. Appellant insists that the transaction was merely the exchange of the Norway bonds for the Texas bonds, respondent acting as agent to effect that exchange.

On October 29, 1929, a receiver was appointed for the insolvent respondent. Salomon Brothers and Hutzler (respondent's eastern representatives), from the time of the purchase thereof on respondent's order of October 10, 1929, held the Texas corporation bonds, or a confirmation or interim receipt in lieu of the bonds, together with other securities, as security for respondent's account with it. After the appointment of the receiver, Salomon Brothers & Hutzler sold sufficient of such securities to satisfy the indebtedness owing to it by respondent, and delivered all of the securities that survived such sale, including the Texas corporation bonds, to the receiver. The bonds in question were turned over to the receiver November 25, 1929.

At the time of the receiver's appointment, the respondent was indebted as follows: To E. A. Pierce Company, $331,771.50; Salomon Brothers & Hutzler, $338,892.18; Canadian Bank of Commerce, $88,590.19. Upon the hearing of appellant's petition for reclamation of the Texas corporation bonds, and upon the receiver's application for an order to sell all returned securities, the court ordered the sale of all returned securities, including appellant's Texas corporation bonds, and denied appellant's claim for return of its bonds free of contribution.

The court was of the view that those customers whose securities survived the sale were not entitled to a return of their securities because they survived and could be identified in the hands of the receiver; that, as such securities were returned only because the lien of Salomon Brothers & Hutzler thereon was released

by the sale of securities belonging to other customers, the owners of the returned securities should be required to contribute their pro rata share of the loss caused by the wrongful pledging and subsequent sale. That is, all pledges made by the respondent were wrongful and placed all customers—marginal customers and outright purchasers—in one class, requiring them by the sale of returned securities to contribute among themselves their proportionate share of the loss incurred by such wrongful pledging.

■ Appellant first contends that it is entitled to a return of its bonds, free from contribution, because the bonds were at no time in the Salomon Brothers & Hutzler pledge.

While the record does not disclose that the very bonds were or were not in the Salomon Brothers & Hutzler pledge, the record is clear that temporary bonds, in the form of a confirmation or interim receipt, were in the possession of the pledgee from the date of purchase of the Texas corporation bonds. Such interim receipt was as valuable to the pledgee as security for respondent pledgor's indebtedness as the bonds would have been, such receipt being negotiable in form. The pledgee could have sold the temporary bonds if it had been necessary to sell all of the securities in the pledge to satisfy respondent's indebtedness, or it could, had it so desired, have sold the bonds instead of, or along with, the other securities which were sold to satisfy the debt.

The securities, including the Texas corporation bonds, surviving the sale by the pledgee, were delivered to the receiver on November 25, 1929. Those securities were returned, as other securities in the pledge, belonging to other of respondent's customers, were sold to pay respondent's indebtedness. A portion of the debt that was satisfied by the sale of such

securities was, of course, created by the purchase of the Texas corporation bonds for the appellant on respondent's order. That is to say, the payment of that part of the debt incurred by the purchase of the Texas corporation bonds for the appellant was made by sale of other customers' securities.

Appellant next contends that this was an outright purchase of the Texas corporation bonds; and that an outright purchaser of securities returned by the broker's repledgee after liquidation of the broker's indebtedness, is entitled to the return of those securities free from contribution to margin customers where securities are traceable.

Is the appellant required to contribute its proportionate share of the loss caused by the wrongful pledge of the customers' securities (margin and outright purchases), and the subsequent sale thereof to satisfy that lien, or is the appellant entitled to a return of its Texas corporation bonds (an outright purchase), free from such contribution?

The securities, both margin and outright purchase, bought by respondent through its eastern correspondent, were wrongfully pledged by the respondent to the latter. While a stockbroker may pledge margin collaterals of his customers up to the amount of the debts due from them, the pledging by respondent to its eastern correspondent of margin customers' securities in excess of the debts due from those customers to respondent, was wrongful.

The rule that the broker has implied authority to repledge the securities of his customers, when such stock is purchased on margin, is subject to the limitation that the broker can only repledge stock to the extent of the indebtedness thereon. *Austin v. Hayden,* 171 Mich. 38, 137 N. W. 317.

The rule, as announced in 4 R. C. L., p. 268, § 18, reads as follows:

"There is one important limitation to a broker's right to repledge, and that is, that he can do so only to the extent of the indebtedness that is due him from his client. The purpose of this is to protect the customer so that if necessary he could go to the pledgee of the broker and obtain his securities by payment of the amount of his indebtedness due to his broker. Of course, in so far as the rights of a bona fide pledgee are concerned, a broker has the actual power to repledge for a greater amount, where he has been clothed with the indicia of title; but this necessarily involves a breach of his duty to his client."

From the time the respondent pledged its customers' securities for an amount exceeding the debt owed by the customers to the respondent, such excessive pledging amounted to a conversion.

"Sproul & Co. might have used the stock in making a specific loan for the purpose of enabling them to carry the stock for the appellee, but, when they used it for any other purpose, they made an improper use of it, and when they pledged it, with other securities under their control for their own indebtedness, they unlawfully converted it to their own use: . . ." *Sproul v. Sloan*, 241 Pa. St. 284, 88 Atl. 501.

"One to whom stock has been pledged for a loan has full power to hypothecate it so long as the original pledgor may obtain possession of it upon payment of his debt; but if it has been mingled with the other securities of the pledgee, or has been rehypothecated by him to secure a different or larger debt than that for which it was pledged to him, or if the collaterals have been transferred, but the obligation they were given to secure retained, or if it has been in any way placed beyond the control of the pledgee, this is a conversion." 31 Cyc. 837.

"A broker who has bought stock for another . . . may, so long as he has not been paid or tendered the amount of his advances, pledge it to the extent of his

lien thereon as security for his own debt to a third person without being guilty of conversion or breach of contract, provided the broker has the stock under his control, and can resume possession by paying the amount borrowed thereon. . . . But he is guilty of conversion if he pledges the stock purchased for an amount greater than the amount of his lien thereon, or if he resells or otherwise uses the stock in a manner inconsistent with the customer's ownership, without retaining control of sufficient similar stock, so that he is unable to make delivery on demand and a tender of his balance of the price." 9 C. J. 544.

"In marginal transactions, however, the broker usually has either express or implied authority to hypothecate the stock purchased in behalf of his client; but even here his right to repledge is limited in its extent to the amount of the indebtedness that is due him from his client. Consequently, if he repledges for a greater amount, it is an act of conversion on his part." 4 R. C. L., p. 287, § 33.

Each repledge by the respondent of its margin customers' securities for an amount exceeding the indebtedness of the customer to the respondent, constituted an unlawful pledge. So, too, the pledging of the securities of an outright purchaser would constitute conversion. That is to say, the pledging was wrongful in each case—the one in part (excessive pledging of margin customers' securities), and the other in whole (the pledging of securities of the outright purchaser). While each pledging was wrongful as to the owners of the securities, such acts of pledging were binding in favor of the pledgee, and secured a valid lien on such securities for the payment of respondent's indebtedness to its eastern correspondent. It follows in logical sequence, both classes of securities being hypothecated without authority, and the conversion differing only as to the amount unlawfully pledged, that all the securities become subject to a common burden.

That is a sound rule and fair to all. Under it those customers (purchasers on margin) who had not fully paid for their stock would share in the surplus fund to the extent of the excess for which their securities were pledged and sold; that is, to the extent of their credit balances appearing after the sale. The credit balances of the outright purchasers, and the extent to which they would share in the fund, would be the amount they had paid for their stock. The principle that joint contribution may be enforced is applicable to the facts in the case at bar. The situation of the parties is equal. The securities of all were pledged without authority. In *In re Wilson & Co.*, 252 Fed. 631, that portion of the opinion reading as follows, aptly states the reason for the rule:

"The proposition thus advanced by those opposing Rolph's contention seems obvious upon simple principles of equity, for nothing is better settled than that equity will treat alike those similarly situated. . . . If, however, it be held that, after a petition in bankruptcy has been filed, the pledgee, by selecting for sale some stocks and not others, can thereby save some stocks intact for the owners without burden of contribution, and not others, it can readily be seen that the door will be opened for the most indefensible kind of favoritism, and possibly for corrupt bargains between the owners of securities and the pledgee. Indeed, a pledgee, of his own motion, without any agreement with owners of securities, could easily safeguard his friends to the detriment of others who are strangers to him."

In the annotation at page 1219 of 38 A. L. R., the rule is stated as follows, as to the superior equity of securities hypothecated without authority over securities hypothecated with authority.

"The cases seem generally to hold that where securities belonging to different owners are validly but wrongfully pledged by a third person and some of the

securities, or the funds realized therefrom, survive a sale by the pledgee, the loss is to be borne pro rata, and that those whose securities have been sold are entitled to contribution from those whose securities, or funds received on a sale thereof, have survived the sale.''

In the application of the rule, some of the courts have held that an outright purchaser is in a superior position to a margin customer. The reason underlying that line of decisions is that the customer purchasing on margin has either expressly authorized, or such authority obtains by implication, that his stocks may be pledged, while the outright purchaser does not authorize the pledging of his securities. We deem the rule followed by the trial court a correct one, equitable and based upon sound principles. That is, as to the excessive pledging of the margin customers' securities, that was an unlawful pledging. So, too, the pledging of the outright purchasers' securities was a conversion. Both are on the same plane, and, as hereinbefore stated, the pledging in each case was unauthorized and differed only in degree.

In *Asylum of St. Vincent De Paul v. McGuire,* 239 N. Y. 375, 146 N. E. 632, 38 A. L. R. 1214, it was held that, where the situation of persons is equal, and one has borne more than a just share of the common burden, he is entitled to contribution from others who have been dealt with more fortunately. In that case the stock of different owners was wrongfully pledged by brokers as security for the brokers' debts. Those whose stock was not actually sold for satisfaction of the debt, were required to contribute to the loss of those whose stock was so sold, although there was no original relationship between the different owners, and the pledge of each lot of securities was a separate and distinct transaction. The court said:

"The important and controlling question on this appeal is the one whether an owner of securities criminally but effectively pledged by a depositary for his own debt, and which have survived sales by the pledgee to satisfy the debt, must make contribution to another owner of securities similarly pledged, but which have been sold to pay the common debt. . . .

"The plaintiff contends that if the doctrine of contribution is to prevail, its equities are greater than those of the other appellants, because its securities were wrongfully turned into the possession of the firm of Amy and Company by one of its members, who, as treasurer of plaintiff, had possession of such securities, whereas the other owners voluntarily deposited their securities with said firm, although only for safekeeping, and not as security for the payment of any indebtedness, and that, therefore, it ought to have a prior lien on any fund. . . . From an ethical or moral standpoint, perhaps it might be said that the plaintiff was the victim of a greater breach of trust when its treasurer put its securities in the way of being criminally pledged with the bank, than the other parties who had voluntarily deposited their securities with the stockbrokers for safekeeping. From a legal or equitable standpoint, however, we do not think that this difference in circumstances can be made the basis of any differentiation in the rights of the different parties. In each case the owner of the securities has suffered from the criminal act of the stockbrokers in wrongfully pledging securities with the bank. That is the basis for the equitable claim for relief, and in each case it is the same, and leads to the same rights.

"This brings us to the main question of contribution, and we think that the views entertained by the appellate division are the correct ones. While the acts of the brokers in pledging these securities were larcenous as to the owners, nevertheless the acts were effective and binding in favor of the pledgee, which secured a valid lien thereon for the payment of its indebtedness, and the securities thus became subject to a common burden. Thus, the final result, which becomes the basis of our action, was that by the action of those

having possession thereof, as governed by the law applicable to a *bona fide* pledgee, the respective securities of all of these owners were validly pledged for the payment of the same debt. All of them were brought into precisely the same situation, and their respective securities had become subjected to a common burden. In our opinion it makes no difference here that the process which ended in this result commenced with a criminal act, or that there was no original relationship between the different owners, and that the pledge of each lot of securities was a separate and distinct transaction. *Armitage v. Pulver,* 37 N. Y. 494; *Robinson v. Boyd,* 60 Ohio St. 57, 67, 53 N. E. 494; *Chaffee v. Jones,* 19 Pick. 260. The controlling circumstances are that, even though by wrongful and separate routes, the different lots of securities, through the acts of a common pledgor, reached the same termination, where they were lodged in the possession of the same pledgee, validly pledged for the same debt, and indisputably subjected to the same burden. That is the situation with which we start and with which we have to deal, and in dealing with it we must remember some of the well-settled principles which govern our consideration.

"The right to contribution here invoked is not dependent on contract, or joint action, or original relationship between the parties. It is based on principles of fundamental justice and equity. *Wells v. Miller,* 66 N. Y. 255; *Cuyler v. Ensworth,* 6 Paige 32. And of these principles no one is more explicit and outstanding than the one that where the situation of the parties is equal, and one has borne more than his just share of the common burden, he is entitled to contribution from others who have been dealt with more fortunately. *Stowell v. Richardson,* 3 Allen 66; *Manthey v. Schueler,* 126 Minn. 87, 147 N. W. 824; Ann. Cas. 1915D 241; *Hodgdon v. Peet,* 122 Minn. 286, 142 N. W. 808. This is simply the statement in another form of the principle that equality among those similarly situated is equity, and all of these principles applied to the facts of this case seem irresistibly to lead to the conclusion that where—through mere chance, as we assume—one security owner has been made to bear

a larger proportion of a common burden than was his just share, he is entitled to call for contribution and assistance.

"We suppose that no one will doubt that, if the situation of all of these wrongfully pledged securities had been discovered before the sale of any of them, and the owner of one lot had brought an action in equity to have them marshaled and applied pro rata to the payment of the indebtedness, for which they were pledged, such prayer for relief would have been granted. Such relief would have been based upon obvious principles of equity and justice, and it seems to us quite inconceivable that the application of those principles is curtailed or destroyed because, before the request for equality of treatment is made, the pledgee, as a mere matter of chance, has reached out and taken securities of one holder for sale and left those of another intact.

"When we come to the consideration of authorities by which to test this view, we find that the question which we are discussing seems to have come up most frequently in proceedings dealing with the bankruptcy of the pledgor, and the cases and decisions are not entirely harmonious, although we think their preponderating weight is in favor of the conclusions which we have expressed."

In *In re Archer, Harvey & Co.,* 289 Fed. 267, most of the petitioners owed the bankrupts greater or less sums, and the securities in which they were trying to assert rights were delivered to the bankrupts or left with them to protect that indebtedness.

"It does not appear that any of the petitioners gave the bankrupts any express authority to rehypothecate their securities, and any implied power to do so, was of course limited to the amount of the bankrupt's advances to them. Any pledging beyond that amount was wrongful as was any hypothecation at all of the securities owned of the persons who were not indebted to the bankrupts. Under the circumstances of this case, it seems at once just and practically expedient to treat the petitioner whose securities were pledged for

a greater amount than that for which the bankrupts had any right to burden them as being as to such excess, but as to that only, in the same class with those whose securities have been hypothecated, although they owed the bankrupts nothing.''

In *In re Irving Whitehouse Co.*, 293 Fed. 287, it was held that, where bankrupt stockholder converted securities purchased for its customers on margin, so that their debit balances were converted into credit balances, the broker deprived itself of any right it previously had to pledge such securities, and the equities of those customers in the surplus proceeds of the pledged securities were on a par with those whose securities were wrongfully pledged at the outset.

Among the decisions sustaining the view of the appellant is that of *Blankenhorn-Hunter-Dulin Co. v. Thayer,* 199 Cal. 90, 247 Pac. 1088. The court held that, where the broker's correspondent purchased stock, the purchaser paying the broker in full, the customer was entitled to recover the stock as preference upon the bankruptcy of the broker, though the latter had never paid its correspondent for the stock, and the correspondent had sold stocks of the broker's customers purchased on margin to pay for the stock in question. The court said:

''The equities of the fully paid customers and of the marginal traders are therefore not equal, and, as ratable contribution may be enforced only as to those of the same class, the marginal traders whose securities were rightfully pledged and who took the risk of a repledge cannot justly complain of the preference given to those whose securities were wrongfully pledged and who took no such risk.''

The customers in the case at bar are all within the same class. The pledges of the securities of each were wrongful. There was neither express authority or implied authority to pledge the margin customers' stock

in excess of the indebtedness of such customers to the respondent. There was no authority to pledge the appellant's stock in whole or in part. The situation, as stated above, of the parties is equal, and, for the reasons given, the rule observed by the trial court should be followed.

"Where the situation of parties to a transaction is equal and one has borne more than his just share of a common burden, he is entitled to contribution from others who have been dealt with more fortunately.

"An owner of securities criminally but effectively pledged by a depositary for his own debt and which have survived sales by the pledgee to satisfy the debt, must make contribution to another owner of securities similarly pledged and which have been sold to pay the common debt." (Syllabus) *Asylum of St. Vincent De Paul v. McGuire*, 239 N. Y. 375, 146 N. E. 632, 38 A. L. R. 1214.

The judgment is affirmed.

TOLMAN, C. J., BEALS, BEELER, and FULLERTON, JJ., concur.