## ROBERTS et v STATE

Ohio Appeals, 1st Dist, Hamilton Co

Nos 4240 & 4243. Decided Jan 9, 1933

Sanford Headley, Cincinnati ,and Walter K. Sibbald, Cincinnati, for plaintiff in error.

Robert N. Gorman, Prosecuting Attorney, Cincinnati, R. T. Dickerson, Cincinnati, and Vern H. Wilson, Assistant County Prosecuting Attorneys, for defendant in error.

SHERICK, J, (5th Dist) sitting by designation.

**SHERICK, J.**

It is the first claim of the accused that §13108-2 GC, is unconstitutional, first, in that it is unreasonable, oppressive, confiscatory, and in contravention of their rights; second, that being a law of a general nature it has not uniform operation; third, that it is so vague, indefinite, and uncertain that it is not understandable; and, fourth, that by reason of its uncertainty, that it violates the constitutional provisions of due process of law. The section reads:

"Any broker in stocks or bonds who (a) having in his possession for safe keeping or otherwise stocks, bonds, or other securities belonging to a customer, without having any lien thereon or any special property therein, pledges, sells or disposes thereof without such customer's consent, or (b) having in his possession stocks, bonds or other securities on which he has a lien for indebtedness, pledges the same for more than the amount due to him thereon, or otherwise disposes thereof for his own benefit without the consent of the customer, and without having in his possession or subject to his control stocks, bonds or other evidences of debt of the same kind and amount available for free delivery and sufficient to satisfy all customers entitled thereto upon demand therefor and tender of the amount due thereon and thereby causes the customer to lose in whole or in part such stocks, bonds or other securities of the value of proceeds thereof, shall be imprisoned in the penitentiary not more than ten years, or shall be fined not more than $10,000, or both."

It may first be remarked that this section has never been considered in any reported Ohio case. The section was taken from the Penal Section (965) of the laws of New York, with some modifications. The courts of that state, in so far as we are able to learn, have had but in a few instances occasion in criminal cases to consider that state's act. Its constitutionality has never been questioned.

In **Holsman v Thomas, City Clerk et, 112 Oh St, 397,** it is held, that within the police powers, laws may be enacted to protect the public from financial loss, and that certain businesses and occupations may be so regulated as to prevent frauds upon the depositing and investing public. Ohio in numerous instances has recognized the necessity of such protection of the public's goods and monies placed in the possession of those engaged in certain businesses, examples of which are found in §710-172, GC, defining embezzlement of bank funds and deposits by a bank's officers. §12472, GC, is a like section, referring to Building and Loan Associations. §12469, GC, refers to innkeepers and carriers. §12470, GC, has reference to warehousemen and consignors. Such statutes have universally been upheld, for they are general in their nature and have uniform operation throughout the state on all persons engaged in that class of business. The section in question here has the intent and purpose of protecting the public in its investments. It is a valid enactment in the accomplishment of that

purpose and is not unconstitutional in the respect claimed. Nor is it oppressive and confiscatory. All criminal enactments are oppressive to those whose criminal activities are curtailed thereby. But it must be remembered that the people have some rights, one of which is, that an investment broker may not, without the consent of the customer, appropriate his property to his own use in any manner he chooses. If he chooses to engage in such financial enterprises, he must comply with the restrictions imposed thereon; and a statute which assures an investor that he may get back his securities, or their equal in kind, on payment of his indebtedness to his broker is but fair and just. It would indeed be confiscatory and oppressive to an investor if such were not true. The statute but makes that a crime which was theretofore recognized as a civil wrong.

Is the statute vague, indefinite, and uncertain to the extent that it should be held unconstitutional? Our answer is that it is not. The purpose and intent of the act is clear as previously indicated. Its provisions are not in conflict. Neither is it incomplete, nor is it necessary for this court to supply any deficiency therein, as far as the facts in the case are concerned. The defendants have been engaged in the brokerage business for many years. They should have been conversant with the rules of the game in which they engaged. The law is that criminal statutes which create and provide for the punishment of criminal offenses must be so clear and explicit that all persons of ordinary intelligence who are subject to their penalties will understand their provisions. This statute was of such a character. We must conclude that the defendants knew the statute's purpose and intent, and what a broker was not permitted to do, and what he must do and perform to free himself of its burden if he did rehypothecate his customer's pledges for a greater amount than the customer's debt or otherwise disposed of such for his own benefit, without the consent of the customer.

Perhaps, without explanation, the statute is not understandable to the ordinary layman, or an attorney or a court for that matter. That should not make it unconstitutional for vagueness or uncertainty. The true test is, is it understandable to a person of ordinary intelligence who is subject to its penalties. It applies to stock brokers, and if it is understandable to a stcok broker it is not vague and uncertain.

We would next consider the defense made in that the brokers had the full consent of their customer to rehypothecate the purchased and pledged securities of the customer for a greater amount than she owed the brokers. Reverting to the finely printed notation appearing on the confirmation purchase slip, we hold this not to be a consent for so doing. We adopt the reasons stated in Heaphy v Kerr, 180 N. Y. Supp., 542, affirmed without report in 232 N. Y., 527;

"Here he was merely receiving notices of purchases by the brokers. He was making no contract, and signed nothing. No one has reason to expect that, in the mere notice of the purchase of stock, the broker is inveigling him into some further contract as to rights in collateral which he would not otherwise possess. * * * With proof positive that he did not read them, and with no legal obligation to read them, there can be no implied consent to the making of a new contract by reason of his failure to express dissent therefrom. * * * if an implied consent may be deemed sufficient, that implied consent must be upon facts that leave no mistake that the party against whom the consent is implied intended to give it."

Meyer, in his work "The Law of Stock Brokers and Stock Exchanges," remarks what a broker should do, and what is generally done by a broker in accepting his customer's order: (Which things the defendants did not do in this instance or require of many of their customers).

"In practice a broker cannot conduct business without repledging the securities of his marginal customers in his general loans. As these loans are virtually always for amounts in excess of the indebtedness of any particular customer, brokers find it necessary, in order to escape criminal responsibility under this section, (Penal Section 956 of the laws of New York) to obtain the written consent of marginal customers to rehypothecate the customers' securities in their general loans."

And now considering the instrument executed by the customer at the time of the pledge of the 25 shares of bank stock:—We entertain the view that this was not a consent to an unauthorized pledge as contemplated by our act, nor authority to the brokers to otherwise dispose of this stock for the brokers' benefit. By its very terms, it does not so import. It goes no further than grant the brokers a right which they

already lawfully possessed. It was no doubt taken because of the fact that the certificate was issued in the name of the customer's sister, and was the brokers' protection for its future lawful repledge.

The record discloses in reference to the second count, that the Anderson note, held by the accused in their lock-box in bank, solely for safe keeping, was not amply secured. And learning that the owner desired to recheck its securities, the brokers attached the bank stock to the note as collateral. This act on its face looks like a pledge thereof. However, it appears from the record that Roberts, on February 19th, 1930, had testified in a civil proceeding then considering this note and bank stock, that his firm had no interest therein. Taking this as true, the act could not have been a pledge thereof to Anderson, for as pledgor his firm would have had an interest therein, that is its right to redeem. But if it had no interest therein by way of pledge then the brokers must have otherwise disposed thereof for his or some one else's benefit without the consent of the customer. Now this was in contravention of the terms of the statute, unless the brokers had in their possession or subject to their control similar and sufficient bank stock. The record shows that they did not have such in their possession, and, further, that other non-consenting customers' stock of like kind had been repledged or otherwise so disposed of by the brokers.

It is shown by the record that upon order of court, in the civil proceeding noted, that this bank stock was turned over to Mrs. Anderson and sold; and that Mrs. Passmore did not, and could not get her stock back; neither did she, or could she have gotten sufficient stock of like kind in its stead, for two reasons, the brokers had no stock of like kind, and the brokers being hopelessly insolvent, she did not, and could not, in whole or in part, receive the value thereof.

Now it remains to be considered if the words of the statute, "upon demand therefor and tender of the amount due thereon" have any speical significance in the nature of a condition precedent with respect to fixing criminal responsibility upon the defendants.

Is it the purpose and intent of the statute in this provision to make it incumbent upon the State to prove demand and tender as a part of its case? If this is so, then this judgment must be reversed. Or was it the legislative purpose to advise a broker that he should at all times so keep his house in order that upon a customer's demand and tender, he could escape criminal responsibility, if he had in his possession, or under his control, stock of like kind, or in lieu thereof, could make the customer whole by avoiding a loss to him?

We are of opinion that the latter is the correct understanding and interpretation of the section under consideration.

Our Supreme Court, in an embezzlement case, found in **State v Bailey, 50 Oh St, 636,** reasons, that a demand and failure to account is but evidence of the crime and that the crime was committed when the moneys were wrongfully converted, and "if a demand was necessary to complete the offense of embezzlement, the offender could always prevent its completion by a timely flight." Now reason prompts the invocation of like logic in interpreting the statute before this court. The gravamen of the act is: (a) in pledging stock upon which the broker has no lien; and (b) in repledging stock for a greater amount than the customer's debt, or in otherwise disposing of pledged stock for his own benefit, without the customer's consent, when the broker has no stock of like kind and amount available in his possession or under his control to satisfy all his customers, who have pledged like stock, and to save them from loss in whole or in part thereof; and not in a requirement that the customer shall first make demand and tender of the amount of his debt. The broker might be insolvent, as they were in this instance, and the doing of these acts would have been a vain requirement. A customer might have pledged his all, and this all may have many times exceeded his debt. Can it be that a customer's demand and tender is a prerequisite to fixing criminal responsibility upon his broker for his wrongful act already done? If so, the statute is farcical and a shield for the wrongdoer.

The Second Circuit Court of Appeals, considering the New York Act, in the case of In Re Salmon Weed & Co., Inc., and Scheuer et v Salmon Weed & Co., Inc., et, 53 Fed. Rep. (2d Series) 335, (79 A.L.R., 379), held:

"Stockbrokers' unauthorized repledge of customer's stock for greater amount than original loan, especially where state statute declared such act felony if customer suffered loss, **held** conversion ipso facto, without customer's tender or demand (Penal Law N. Y. §956)." Paragraph 6, syllabus.

The court makes the further observations in the opinion in the Salmon Weed Company case:

"Certainly the legislative policy as to rehypothecation by a broker of a customer's stock to secure amounts in excess of his own advances is very clear. Unless consent of the customer is obtained, the transaction is undoubtedly illegal, and if loss ensues it is a felony.

"There is another reason for holding that a repledge for an amount in excess of the original loan is a conversion. If such a repledge is only a conversion where there is a financial inability to make a tender, a wrongful repledge will rarely affect a solvent broker. He can, go merrily on in fair weather using his customers' stocks as capital in his business, whereas when storms arise such unlawful repledges are certain to cause losses to creditors who have given no authority to repledge their stocks beyond the amounts of their own indebtedness. In other words, to impose no liability upon a broker for such unauthorized acts tempts him to risk his customers' property in good times for his own advantage and to make his customers bear his business losses if he becomes insolvent. The most practical way to check such wrongs is by treating brokers who have used their customers' securities without the latter's consent as converters. This on principle they certainly are.

"Whether a demand and tender are necessary before an excessive repledge can be regarded as a conversion has not been decided by the New York Court of Appeals.

"While the Appellate Divisions have uttered discordant notes and the Court of Appeals has not yet spoken on this precise question, American Courts in general, and the New York courts in particular, have been almost unanimous in holding that a sale by a pledgee contrary to the terms of the agreement is a conversion and that trover will lie without a tender or demand. In reason the same rule should apply to a repledge for an excessive amount."

We see no reason why the same rule should not apply with equal force in a criminal action for an unlawful disposal of stock, for the benefit of a broker, without the consent of the customer.

And now examining the matters pertaining to the third count:—We learn from the record that within four days from the pledging of the $16,000.00 worth of bonds, the defendants made voluntary application for the appointment of a receiver. They knew that they were hopelessly insolvent, that their brokerage account requirements according to the rules of the New York Stock Exchange, of which they were members, needed bolstering to the extent of some $800,000.00. Nevertheless, they repledged their customer's bonds, without her consent, as collateral to their Goodman loan of $32,000.00. They now say that in doing so they were within their rights, and that such was not an excessive pledge. We do not think so.

It must be kept in mind that the customer's purchased securities, to-wit: 200 shares of Amrad, and 200 shares of Crosley and 630 shares of General Motors stock, had already been repledged with the defendants' New York correspondents to secure the defendants' general loans for many thousands of dollars, an amount far in excess of $35,613.95, plus interest, the customer's debt. And her bank stock had been negotiated to secure a $43,000.00 private loan.

It is said in Meyer's work, previously mentioned, at page 337:

"The provision of the Penal Law of the State of New York prohibiting rehypothecation of the customer's securities for an excessive amount is broad enough in its scope to prohibit a rehypothecation in the broker's general loans."

We agree with this statement, and it is equally true of the Ohio law. Now when the defendants repledged these bonds, they had already rehypothecated their customer's securities for an amount in excess of her debt, without her consent. They, therefore, knew that any repledge of these bonds for any amount on their part would be an excessive pledge without her consent and unlawful. It was not the agreement that the customer should finance her agents' business in its entirety, but only that she should protect her marginal account.

To say that a broker may take, for instance, his customer's purchases and marginal stock payments pledged as security, if purchased and pledged in six blocks at different times, and rehypothecate each block for an amount somewhat less than the customer's final or total debt, and then to permit the broker to say that the last purchased block or pledged securities received were only rehypothecated for an amount less than her debt, would be to countenance and recognize as lawful, say six repledges of $10,000.00 each, making these repledges in toto $60,000.00, when the customer's total debt was perhaps only $20,000.00. The fallacy of such a claim is at once discernable.

It is the intended spirit and purpose of the law that a broker at all times should so

manage his business that his customer upon tender of the balance due to the broker may demand and receive the purchased and pledged securities in like kind and amount, and that the customer's balance due when tendered and paid should fully liquidate any and all of her broker agents' debts which are secured in whole or in part by her purchased or pledged securities, so that she may have that which is her own without reliance upon the credit or ability of the broker to pay. This, of course, is qualified in that the customer had not consented thereto, or that the broker out of stock in possession or under his control might otherwise satisfy his customer in like kind and amount, as the statute provides.

We direct attention to the case of Vance Lumber Co. v Fraser, Goodwin & Colver, 162 Wash., 347 (298 Pac. 438), wherein the following statements were made:

"Each repledge by the respondent of its margin customers' securities for an amount exceeding the indebtedness of the customer to the respondent, constituted an unlawful pledge.

"From the time the respondent pledged its customers' securities for an amount exceeding the debt owed by the customers to the respondent, such excessive pledging amounted to a conversion."

It is, therefore, our view that the State had a perfect right, and was required to prove that the brokers' previous pledges of the prosecuting witness' securities was for an amount in excess of her debt. Such was proved conclusively in this case. The defendants' wrongful act in making a repledge of her bonds to secure an amount greater than the customer's debt was definitely shown.

Conviction on this count might be affirmed upon another ground. The customer asserts that when she delivered her bonds in pledge, it was understood that the brokers were to return to her 100 shares of her General Motors stock, previously pledged. This, agents of the broker's deny. It was a disputed issuable fact, of which the jury was the judge. If the customer's testimony was true, then the brokers had no right to these bonds as securities pledged to them without return of these 100 shares to the customer, which was never done, and subdivision (a) of the Act would have covered the situation.

The State's theory of this prosecution was founded on the assumption that the defendants were engaged in a conspiracy to cheat and defraud their customers, one of whom was Mrs. Passmore. To that end, it proceeded to make proof of known insolvency, of similar transactions, and of other independent acts criminal in character. The defendants claim that in the admission of this testimony they were prejudiced. They further maintain that intent was not an issue, and that admitted proof of any plan or scheme to show any such intent was highly erroneous.

We are of the view that intent was an issue herein. The defendants do not admit that the customer's securities were pledged "for his own benefit." It was, therefore, the State's burden to prove that fact. Had it not done so, it might have been advanced that the acts complained of were the result of mistake or for the benefit of another, and the State must have failed. By proof of conspiracy, of which intent is always an element, and of a criminal practice and plan and other like and similar transaction, all going to show that the defendants converted the pledges of other customers to their own use, it was established beyond question that these acts were done for their own benefit.

The intent of the defendants being an issue, §13444-19, GC, has direct application. We see it recognized and approved in **Beckman v State, 122 Oh St, 443.** In Sprague v State, —— Ind., —— (181 NE 507), it was recently held that acts of a different kind were admissible in evidence "not for the purpose of showing the commission of distinct crimes, but as tending to show a general system inaugurated by" a stock broker "to defraud, or as bearing on the question of criminal intent in his dealing with" his customer. All this evidence was properly qualified not only on its admission, but also by the court's general charge.

The defendants make the point that the customer did not attempt to recover her securities; that she in fact made an agreement with the receiver to stand as a general creditor of the insolvent defendants. They say that she sustained no loss, but in almost the same breath we are told that she has received a 40% dividend from the receiver. She had a provable claim, whatever its amount was. She has lost 60% thereof. She must, therefore, have received a loss "in part." Mrs. Passmore did all that she could do. She could not have recovered her repledged securities from the defendants' innocent pledgees thereof, even if her brokers had wrongfully hypothecated them. None of her securities remained unpledged, hence the exclusion of the court's order in

the receivership transaction fixing a time limit for recovery of securities of the defendant firm could in no way change Mrs. Passmore's position, or minimize her loss, nor could this evidence have aided the defendants.

We are unable to find any prejudicial error in the charge of the court when considered as a whole, or in any of the other claimed errors, and it is our judgment that the judgment of the Court of Common Pleas of Hamilton County be affirmed, and the causes are remanded for execution of sentence.

ROSS, PJ, and HAMILTON, J, concur.