William L. and Georgia I. BORDEN,
Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 79–649.

District of Columbia Court of Appeals.

Argued April 30, 1980.

Decided June 16, 1980.

William L. Borden, pro se.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellee. Robert E. McCally, Richard L. Aguglia, James E. Lemert and Robert J. Harlan, Jr., Asst. Corp. Counsels, Washington, D. C., also entered an appearance for appellee.

Before NEBEKER, MACK and PRYOR, Associate Judges.

MACK, Associate Judge:

Appellants/taxpayers dispute the District of Columbia's determination that the sale of

certain collateral held by a bank was a taxable event for them. The bank mistakenly sold appellants' pledged securities and, upon discovery of the error, repurchased the stock. The trial court agreed with the District that the bank's action constituted a sale and later repurchase of the stock by the taxpayers.[1] Appellants argue that the bank's action constituted a tax free exchange of stock.[2] Although we disagree with the characterization of these transactions by both parties, we agree that these transactions did not mark an event requiring appellants to recognize capital gain.[3]

The facts of this case are not disputed. The trial court found the following:

> On or about April 20, 1972, petitioner pledged 1700 shares of Westinghouse Electric Corporation (Westinghouse) stock with the American Security and Trust Co. (Bank) as security for a demand loan of $48,000. Petitioner William Borden was for many years prior to this transaction a management employee of Westinghouse and in that capacity he received options to purchase and did purchase a number of shares of Westinghouse common stock through that company's restricted stock option plan. He left Westinghouse in 1971 and set up his own Washington office as a business consultant. In September 1972 the market value of the stock declined and in accordance with a bank policy not permitting the amount of a loan to exceed 60 percent of the market value of the collateral securities, petitioner was requested to reduce the loan, pledge additional securities, or sell a portion of the stocks sufficient to bring the loan back into conformance with the 60 percent policy.

In response to the request by the Bank, petitioner directed an officer of the Bank either to sell 600 shares at $41.50 per share or else to "stop-sell" 1,000 shares at $38.50 per share, whichever might occur first, depending upon the fluctuation of prices in trading on the New York Stock Exchange. During the afternoon of that same day the Bank sold not only the 1,000 shares which it was authorized to sell at $38.50 per share, but by mistake it sold the remaining 700 shares as well. The sale of those shares was in conflict with the instructions which the petitioner had given the Bank and with his understanding with the Bank. The petitioner discussed this discrepancy with the Bank and it was agreed by the Bank that it would purchase for the benefit of the petitioner the 700 shares sold by mistake and the Bank agreed to defray $1,162.01 of the cost of commissions and the excess of the repurchase price over the sales price. Thereafter in December 1972, he voluntarily sold 100 of the 700 repurchased shares in question and in 1973 the petitioner voluntarily sold the remaining 600 of the repurchased shares. When he filed his income tax returns for 1972 and 1973 he reported capital gains on all 700 shares of the stock at the original purchase price thus ignoring for this purpose the 1972 "sale-repurchase" transaction which resulted from the Bank's mistake. As the result of the settlement with the Bank, the cost of the sale and repurchase of the stock in the amount of $2,393 was divided between the petitioner and the Bank with the Bank paying $1,165 and the petitioner $1,231. This agreement was reached after the petitioner had had several conversations with the Bank.

---

1. For the tax years at issue here, the relevant statute was 26 U.S.C. § 1002 (1970) which specifies:

   Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

   This provision was repealed in 1976. Its substance now appears as 26 U.S.C. § 1001(c) (1976).

2. 26 U.S.C. § 1036(a) (1976) provides:

   No gain or loss shall be recognized if common stock in a corporation is exchanged solely for common stock in the same corporation, or if preferred stock in a corporation is exchanged solely for preferred stock in the same corporation.

3. D.C.Code 1973, § 47–1583a specifies that the issue of the taxability of this gain is to be determined by federal law.

This settlement resulted from the Bank's letter of October 3, 1972, in which the Bank agreed to settle petitioner's alleged claim against it by a "total and final reimbursement offer of the $1,162.01." The petitioner acknowledged that settlement and held the Bank "harmless from any and all claims of any nature from me or others, relating to the sale and purchase of the Westinghouse securities".

In a 1974 audit of Mr. Borden's 1972 tax return, the District of Columbia determined that (1) the bank's disposition of the 700 shares was a taxable event requiring him to recognize capital gain for that year; and (2) the $1,231 expense was not deductible but rather was a capital expenditure to be added to the basis of the repurchased stock.

Before delving into the tax ramifications of these events, we think it prudent to examine more closely the nature of the relationship between the bank and Mr. Borden. The loan arrangement at the heart of the dispute here constituted a secured transaction.[4] Mr. Borden pledged 1700 shares of stock as collateral, held as security by the bank. There are two key terms of the agreement to which the outcome of this case is tied.

[1] [W]hether this obligation shall be due or not due, the undersigned agrees, upon demand of the Trust Company, forthwith to deliver to and pledge with the Trust Company additional securities or to make payments on account to its satisfaction, in case the market value of the said property or any part thereof shall suffer any decline . . . .

[2] The undersigned further agrees that the Trust Company may use or hypothecate said collateral security, or any part thereof, and any additions thereto and substitutions therefor, may substitute or exchange for the same other certificates or bonds of like tenor and amount, may transfer or cause to be transferred to itself or to another, said collateral security or any part thereof . . . .[5]

The events in this case occurred pursuant to clause 1. The bank deemed the collateral insufficient and requested either more stock, a reduction in the outstanding loan balance, or a sale of collateral sufficient to reestablish the 60% relationship between the remaining loan and collateral. Mr. Borden chose the latter option. The essence of these series of events was to renegotiate the terms of the loan and its collateral base. His directions regarding disposition and sale of 1000 shares of the stock were a release of any ownership rights he had—i. e. the right to have that collateral returned in kind upon his performance. When the bank mistakenly disposed of all the stock, contrary to his instructions and without an intent of retaining the obligation to replace the 700, it in effect converted those shares.[6] Indeed at oral argument the District conceded that Mr. Borden probably had a cause of action against the bank for conversion, negligence, and/or breach of contract. He received no proceeds from the bank's sale; the bank still had the contractual obligation to replace the stock; the taxpayer's rights under the contract did not change as a result of the sale.

Against this backdrop we examine the District's contention that the bank's actions constituted an event which appellant was required to recognize for tax purposes. The District asserts that this was a sale and repurchase *by Mr. Borden*; Mr. Borden

4. This type of transaction is covered by Article 9 of the Uniform Commercial Code, codified at D.C.Code 1973, § 28:9–101 *et seq.*

5. Transactions by the bank under this clause are not taxable events to the taxpayer. *See* Rev.Rul. 451, 1957 C.B. 295.

6. *See* D.C.Code 1973, § 28:9–207(1), (3). Section 207 of the U.C.C. is essentially a codification of the common law as stated in Restatement of Security §§ 17 and 18 (1941). *See* D.C.C.E. § 28:9–207 Uniform Code Comment. As a general rule, wrongful or unauthorized disposition of collateral by the pledgee so as to prevent redelivery upon pledgor's performance is a conversion. 69 Am.Jur.2d *Secured Transactions* § 244 p. 68 (1973).

contends it was a mere exchange of stock for his benefit. We think it was neither.

■ In determining whether this disposition of stock constitutes a taxable event, the intent of the taxpayer, and the substance of the transactions as a whole, are of paramount importance. *Bell Lines, Inc. v. United States,* 480 F.2d 710 (4th Cir. 1973); *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652 (5th Cir. 1968). In addition, the word "sale" is to be given its ordinary meaning of a transfer of property for cash. *Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965). Clearly there was a sale of stock here: the questions are by whom and whether the sale is a taxable event requiring recognition of capital gain? Mr. Borden did not sell the stock himself, nor did he authorize the sale either by contract or specific direction.[7] Rather the bank sold the stock. In so doing, it wrongfully converted the collateral it held; it then repurchased 700 shares to correct its mistake and honor its contractual obligation. It is illogical to conclude, as the District did, that the bank by its own actions converted the collateral thereby exercising *all* indicia of ownership, and likewise to conclude that Mr. Borden retained a sufficient ownership interest to pay taxes on proceeds he never received from the unauthorized sale.[8]

■ We conclude the disposition of the 700 shares was neither intended to be nor in substance a sale of stock by appellants.

7. In contrast, the bank's sale of the 1000 shares at Mr. Borden's direction was a taxable event for him. The same would be true if the collateral were sold because of his default.

8. Indeed, the bank would be required to report the proceeds of the sale of the converted stock as part of gross income. *Stoller v. United States,* 320 F.2d 340 (Ct.Cl.1963). It is not reasonable to charge Mr. Borden with the obligation of reporting capital gains income as a result of the very same transaction. Only if he ratified the bank's action would this be the case.

9. D.C.Code 1973, § 47–1557b(a)(4)(B) authorizes a deduction for losses
   *if incurred in any transaction entered into for the production or collection of income subject to tax under this subchapter, or for the*

Accordingly, they do not have to recognize this as a taxable event for capital gains purposes. It follows that the $1,231 in expenses incurred by Mr. Borden in recovery of the stock was properly deducted as an expense incurred in the protection and maintenance of the property.[9]

*Reversed.*

*management, conservation, or maintenance of property held for the production of income subject to tax under this subchapter, though not connected with any trade or business;* Ordinarily brokerage fees must be capitalized. *Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). But in the circumstances here, the purpose of the expenditure was not the acquisition or disposition of a capital asset, but rather its preservation. Mr. Borden argued alternatively that the loss was deductible as a bad debt under D.C.Code 1973, § 47–1557b(a)(5). Since we agree the amount is a valid deduction for the conservation of income producing property, we need not address the applicability of this section.