**SCHREIBER FAMILY CHARITABLE FOUNDATION, Plaintiff,**

v.

**FIRST FINANCIAL ACCEPTANCE CO., INC., Keystone Financial Inc., Edwin D. Wood, J. Tullos Johnson, Norma Lamotte, Richard W. Brown, and Robert I. Wilson, Defendants.**

No. CV 95–2452 (RJD).

United States District Court, E.D. New York.

June 17, 1997.

Peretz Bronstein, Eastman & Echtman, P.C., New York City, for Plaintiff.

Lawrence N. Weiss, Pantaleoni Govens & Weiss LLP, New York City, for Defendants Keystone Financial, Inc. Edwin D. Wood and J. Tullos Johnson.

Norman P. Effman, Buffalo, NY, for Defendants First Financial Acceptance Co., Inc., Norma Lamotte, Richard W. Brown and Robert I. Wilson.

## MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiff Schreiber Family Charitable Foundation ("Schreiber") has sued for breach of an agreement (the "Agreement") to pledge stock as collateral for a loan, and now moves for partial summary judgment. On December 23, 1994, Schreiber entered into the Agreement with defendant First Financial Acceptance Co., Inc. ("First Financial"), pledging 300,000 American Depository Receipts ("ADR's") of Great Central Mines, Ltd. (the "Securities"), an Australian gold mining company, as security for a $1.275 million loan to be made to Schreiber. ADR's are certificates, tradable in the United States, which represent shares of foreign stock. The Agreement prohibits First Financial from "encumber[ing]" the Securities except in accordance with its terms. On the same date, Schreiber executed a $1.275 million promissory note in favor of First Financial. The ADR's were actually delivered to First Financial on or about January 4, 1995, and $1.25 million in loan proceeds were disbursed to Schreiber during January and February. First Financial assigned the loan to defendant Keystone Financial, Inc., an affiliated entity.[1]

Defendants executed short sales of Great Central Mines ADR's against the box, and used the proceeds to fund the loan. Briefly,

a short sale occurs when a non-owner of a security enters an order to sell that security with the intention of later purchasing the security at a lower price (or otherwise acquiring the security) to cover the sale order. In a short sale against the box, the seller actually possesses the security which is the subject of the sale order, but may not deliver it to fulfill that order. Instead, the seller may later borrow or purchase identical securities to fulfill the sale order. *See Bissell v. Merrill Lynch & Co., Inc.*, 937 F.Supp. 237, 240 (S.D.N.Y.1996) (Schwartz, J.); J. WILLIAM HICKS, EXEMPTED TRANSACTIONS UNDER THE SECURITIES ACT of/ 1933 § 10.04[3][d][i] (1992). The securities held by the seller are referred to as "in the box."

In an ordinary short sale, Federal Reserve Board Regulation T requires the seller to maintain an equity margin of at least 150% of the value of the short position (i.e., to hold, in a margin account, pending the required delivery, cash or securities worth at least 150% of the value of the securities to be delivered). *See* 12 C.F.R. § 220.18(c).[2] In a short sale against the box, the seller need not do this, as he already holds securities identical to those which must be delivered. *See* 12 C.F.R. § 220.4(b)(2) ("A short sale 'against the box' shall be treated as a long sale for the purpose of computing the equity and the required margin.").[3] The seller must maintain the securities in the box pending the required delivery or face the 150% margin requirement. In a sense, a short sale is a sale on credit, and the maintenance of the securities in the box, or the 150% margin requirement, serves as the security for the "loan" of the sale price from the buyer. *See Bissell*, 937 F.Supp. at 240.

Schreiber alleges that these short sales against the box "encumbered" the pledged Securities in violation of the Agreement.

---

1. The individual defendants are principals of one or both of the corporate defendants. The Court will refer to "defendants" collectively in this Memorandum and Order, although certain specific acts may have been performed only by certain defendants.

2. Section 220.18(c) of Federal Reserve Board Regulation T, adopted pursuant to section 7 of

the Securities Exchange Act of 1934, 15 U.S.C. § 78g, and codified at 12 C.F.R. Part 220, establishes this 150% margin requirement. At the time of the events in question, this regulation was codified at 12 C.F.R. § 220.19(c).

3. At the time of the events in question, this regulation was codified at 12 C.F.R. § 220.5(b)(2).

When, in January 1995, defendants allegedly failed to document the whereabouts of the Securities to Schreiber's satisfaction, Schreiber withheld all loan payments. Defendants retained the Securities, and began delivering them to cover the short sales on or about March 30, 1995 (at least two months after Schreiber's alleged default). Schreiber claims that the Securities were worth approximately $1.9 million at the time they were pledged,[4] and now claims it is entitled to at least $650,000, the difference between this alleged value and the amount of loan proceeds it received. Schreiber's theory appears to be that when defendants breached the Agreement, Schreiber became entitled to return of the Securities or their market value. Since Schreiber retained the $1.25 million loan proceeds, it now seeks what it claims to be the remaining value of the Securities, measured as of the time they were pledged.

According to Schreiber, defendants delivered 252,000 of the 300,000 ADR's to cover the short sales (which netted $1,527,624, *see* Schreiber's Local Rule 3(g) Statement, at Exh. F, p. 13) on or about March 30, 1995, *id.* At Exh. H, p. 2, and sold the remaining 48,000 ADR's at approximately the same time.[5] Schreiber estimates the actual proceeds of the sales at $1.725 million, less than the $1.9 million at which it estimates the Securities' value when they were pledged. In fact, the value of the Securities decreased rather steadily from January through March of 1995, reaching their lowest closing price for the first half of that year on March 29, at $4.25 per share, or $1,275,000.

Defendants claim that the short sales did not encumber the Securities, and that Schreiber breached the parties' agreement by failing to repay the loan. Defendants cite the Agreement, which explicitly authorizes them to sell the Securities if Schreiber defaults, on notice to Schreiber and "without liability for any diminution in price which may have occurred," and to retain the amount of any outstanding loan principal, interest and related expenses and fees.

Defendants claim they should be entitled to retain the full amounts realized on the sales, even though these amounts exceed the value of the loan. Defendants argue that if they had executed straight sales of the Securities in late March, 1995 (the time they delivered many of the Securities to satisfy the earlier short sales), the return would have been less than the amount they were entitled to under the Agreement.[6] Only because they had previously sold Great Central Mines ADR's short against the box, thereby successfully hedging against a declining market, defendants argue, did they realize more on the ultimate sales than they would otherwise have been entitled to under the Agreement. In other words, they claim they should not have to disgorge their profits from the short sales because, had they disposed of the Securities through straight sales in March, they would have *lost* money. To do otherwise, they claim, would be to penalize them for making what amounts to a propitious business decision. In fact, certain of the defendants have counterclaimed for an unspecified deficiency amount.

## DISCUSSION

The pivotal question for this case, or at least this motion, is whether a short sale against the box "encumbers" the securities in the box. While the Court has not located or been directed by the parties to any relevant judicial authority on this question, the Court concludes that such a sale does not create an encumbrance. While Regulation T requires specified *amounts* of equity to be held in a margin account pending the required delivery of securities sold short, it does not require that specific *securities* be held. So long as defendants' account contained sufficient equity to satisfy the Regulation T mar-

---

**4.** According to NASDAQ quotes provided by defendants, the Securities closed at $6.25 per share, or $1,875,000, on January 4, 1995, when they were pledged.

**5.** Schreiber actually contends in its Memorandum of Law that 272,000 of the ADR's were sold short against the box. However, at numerous other places it contends that 252,000 of the ADR's were sold short. The records of defendants' account support the latter version. *See* Schreiber's Supplemental Rule 3(g) Statement, at Exh. A.

**6.** As stated above, on March 29, 1995, the Securities closed at $4.25 per share, or $1,275,000.

gin requirements, there was no requirement that the pledged Securities remain in the account.

As a practical matter (and as defendants have proposed to the Court), the question of encumbrance amounts to whether defendants could have returned the Securities to Schreiber, at any given time, had Schreiber repaid the loan in full. That is, if Schreiber had repaid the loan in full at any time, and if defendants could have returned the Securities free and clear at that time, then the Securities, for practical purposes, were not encumbered. In fact, defendants could have withdrawn the Securities from the brokerage account at any time, even though they were subject to short sales against the box, so long as defendants deposited, at or before the time of the withdrawal, sufficient equity in the account to satisfy the Regulation T requirements.[7]

Defendants could have satisfied the margin requirements either by depositing assets worth at least 150% of the value of the Securities sold short, or by purchasing identical securities and depositing them to the account. The loan repayment of $1.25 million plus interest might have been used to make such a deposit or purchase. Furthermore, in addition to the Securities, defendants held United States Treasury bonds valued at $403,376 in the brokerage account as of January 27, 1995. Because the Securities' value was declining through the first quarter of 1995, there were times at which the combined value of a full loan repayment and these Treasury bonds would have been adequate to purchase replacement securities sufficient to satisfy the Regulation T requirements. In any event, there appears to be no reason defendants could not have deposited assets from other sources into the account to satisfy the margin requirements. Defendants assert that to find a security encumbered merely because it is held in a brokerage account subject to a margin requirement

would transform accepted practices and the nature of innumerable financial transactions, and make compliance with agreements such as this dependent on the hourly vicissitudes of a dynamic market.

Schreiber points to certain older cases holding that a broker may not rehypothecate pledged securities in excess of the client's debt to the broker. *See, e.g., In re Salmon Weed & Co., Inc.,* 53 F.2d 335 (2d Cir.1931); *Vance Lumber Co. v. Fraser, Goodwin & Colver,* 162 Wash. 347, 298 P. 438, 440–41 (1931). That is, if a client pledges securities to her broker to secure a debt (as when the broker has extended credit to purchase other securities on the client's behalf), the broker may repledge the client's securities to secure the broker's indebtedness to a third party, so long as the broker's indebtedness to the third party does not exceed the client's indebtedness to the broker. The rationale for this rule was that, should the client repay her debt to the broker in full, the broker must be able to return the securities which were pledged as collateral. *See Vance Lumber,* 298 P. at 440–41. Thus, if the broker's indebtedness may be satisfied by the funds of the client's repayment, the client's repayment should make the client's securities immediately available to the broker for return to the client, and there is no conversion. *See Borden v. District of Columbia,* 417 A.2d 402, 404 n. 6 (D.C.1980) ("wrongful or unauthorized disposition of collateral by the pledgee *so as to prevent redelivery upon the pledgor's performance* is conversion") (emphasis added). As these cases are concerned primarily with whether the pledgee can return the collateral upon repayment of the pledgor's obligation, they support the practical definition of "encumbrance" proposed by the defendants and adopted by the Court.

Similarly, section 9–207(2)(e) of the Uniform Commercial Code, which was intended to codify the preexisting case law, *see id.;* official comment to Section 9–207, provides that, unless otherwise agreed, a secured par-

---

7. Defendants contend, in fact, that the market price of these securities was low enough in January, 1995 (the time of Schreiber's alleged default) that, had Schreiber repaid the loan in full at that time, Keystone would have had sufficient equity in the account to purchase identical replacement securities to cover the short sales. Keystone

Defendants' Response to Plaintiff's Supplemental Statement Pursuant to Local Rule 3(g). While the parties dispute whether such a strategy would have allowed defendants timely to return the Securities to Schreiber, it is not necessary to this discussion that defendants could have used this mechanism.

ty may repledge collateral in its possession "upon terms which do not impair the debtor's right to redeem it."[8] Therefore, under the U.C.C., unless the parties agree otherwise, a secured party is free to repledge collateral so long as it can be returned to the pledgor upon satisfaction of the underlying debt.

Because Section 9–207(2) applies only in the absence of contrary agreement, the contractual prohibition on "encumbrance" of the Securities takes the parties out of the scope of this provision. To the extent Section 9–207(2)(e) does apply, however, the short sales would have been permissible *even if* they encumbered the shares, so long as defendants could have returned the Securities upon repayment of the loan.

Plaintiff cites no authority which directly supports the contention that the short sales violated the contractual prohibition on "encumbrance" of the Securities. In this regard, the pivotal distinction from the rehypothecation cases plaintiff cites is that defendants did nothing to grant or otherwise create a security interest in the Securities themselves. While the Securities were, in a sense, by virtue of being the equity in the brokerage account at the time, collateral for the short sale orders, they were not the *required* collateral for such orders; any equivalent security or sufficiently valuable equity would have sufficed. Thus, the only way Schreiber could prevail on this motion would be to demonstrate that, had the loan been repaid in full, defendants could not, under any circumstances, have garnered sufficient assets, from within the account or otherwise, to satisfy the Regulation T requirements and return the Securities to Schreiber. *See* FED.R.CIV.P. 56(c) (summary judgment warranted where there is "no genuine issue as to any material fact"). Since Schreiber has failed to produce such evidence, its motion for partial summary judgment must be denied.

SO ORDERED.

---

**8.** The Agreement provides that Michigan law shall govern its interpretation, and Michigan has adopted this provision of the U.C.C. *See* MICH. COMP. LAWS ANN. § 440.9207(2)(e) (West 1996).